UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

VIRGINIA ANN KENNEDY,

                Plaintiff,

      v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____

<u>DECISION & ORDER</u>

14-CV-6397P


## <u>PRELIMINARY STATEMENT</u>

Plaintiff Virginia Ann Kennedy ("Kennedy") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 12).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 9, 11). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with applicable legal standards. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Kennedy's motion for judgment on the pleadings is denied.

# BACKGROUND

## I.      Procedural Background

Kennedy protectively filed for DIB on August 30, 2011, alleging disability beginning on December 1, 2008, due to back problems and right leg pain.[1] (Tr. 168, 172).[2] On November 10, 2011, the Social Security Administration denied Kennedy's claims for benefits, finding that she was not disabled. (Tr. 86-90). Kennedy requested and was granted a hearing before Administrative Law Judge John P. Costello (the "ALJ"). (Tr. 32, 91-92, 107-12). The ALJ conducted a hearing on November 14, 2012 in Rochester, New York. (Tr. 32-79). Kennedy was represented at the hearing by her attorney Justin Goldstein, Esq. (Tr. 32). In a partially favorable decision dated January 15, 2013, the ALJ found that Kennedy was disabled for a closed period beginning on November 1, 2010 and continuing through February 14, 2012. (Tr. 26). The ALJ also found that beginning on February 15, 2012, Kennedy experienced a medical improvement and that her disability ended on that date. (Tr. 27-28).

On May 19, 2014, the Appeals Council denied Kennedy's request for review of the ALJ's decision. (Tr. 1-6). Kennedy commenced this action on July 17, 2014, seeking review of the Commissioner's decision. (Docket # 1).

---

[1] During the administrative hearing, Kennedy's attorney indicated that the alleged onset date was actually November 1, 2010. (Tr. 37).

[2] The administrative transcript shall be referred to as "Tr. __."

II.    **Relevant Medical Evidence**[3]

A.    **Strong Memorial Hospital – Internal Medicine**

Treatment notes indicate that Kennedy received treatment from Ellen Ingram ("Ingram"), NP, beginning on April 8, 2011.  (Tr. 232-33).  Kennedy reported experiencing daily pain in her right posterior thigh for several years.  (*Id.*).  Kennedy did not recall any trauma to the area and reported that the pain was worse with prolonged walking.  (*Id.*).  She described the pain as a burning, tingling pain in the right lower leg and foot.  (*Id.*).  At the time, Kennedy was working as a certified nursing assistant ("CNA") and reported being very sore at the end of her shifts due to prolonged standing and walking.  (*Id.*).  Upon examination, Ingram noted tenderness in the mid-right hamstring and muscle tightness in the lower leg.  (*Id.*).  She prescribed a trial of gabapentin, referred Kennedy to the pain clinic, and instructed her to follow up in one month. (*Id.*).

On May 10, 2011, Kennedy returned for an appointment with Ingram. (Tr. 231-32).  Kennedy reported ongoing pain that was worse with prolonged sitting or standing. (*Id.*).  According to Kennedy, the gabapentin had not relieved her pain.  (*Id.*).  Ingram discontinued the gabapentin, prescribed Lyrica, and referred Kennedy to physical therapy for evaluation.  (*Id.*).  She advised Kennedy to follow up with her primary care physician.  (*Id.*).

On August 23, 2011, Kennedy returned for an appointment with Ingram. (Tr. 227-28).  Kennedy reported that she would like to return to her previous employment as a CNA, but felt limited due to her leg pain.  (*Id.*).  Ingram assessed right lower extremity pain and lumbar radiculopathy and recommended that Kennedy continue pain management at the pain

---

[3]  Those portions of the treatment records that are relevant to this decision are recounted herein.

clinic. (*Id.*). Ingram advised Kennedy that she should not lift in excess of ten pounds and advised against heavy work. (*Id.*).

On October 12, 2012, Kennedy returned for an appointment with Ingram and reported that she had undergone surgery on her back, but her right leg pain and right foot paresthesias had reoccurred. (Tr. 373). Kennedy reported that she had not experienced a straining injury and was not currently working as a CNA. (*Id.*). According to Kennedy, her pain did not worsen with walking, although it sometimes interfered with her sleep. (*Id.*). Upon examination, Ingram noted tenderness of the right lumbosacral paraspinal area, but no lumbar spine tenderness. (*Id.*). Kennedy's lower extremity strength was symmetric, her reflexes were intact, she had no foot drop, and the straight leg raise test was negative bilaterally. (*Id.*). Ingram recommended that Kennedy take ibuprofen and follow up in three or four weeks. (*Id.*). If Kennedy's symptoms resolved in that time, Ingram intended to consider referring her for physical therapy with her surgeon's approval. (*Id.*). If Kennedy's symptoms persisted, Ingram planned to consider ordering an MRI. (*Id.*).

On November 16, 2012, Kennedy returned for a follow-up appointment with Ingram. (Tr. 366). Ingram prescribed gabapentin for nerve pain and the tingling sensation in Kennedy's foot. (*Id.*). She also recommended that Kennedy continue to take ibuprofen. (*Id.*). Ingram indicated that she would contact her surgeon and would advise Kennedy about physical therapy. (*Id.*).

B.     **Strong Memorial Hospital – University Pain Management Center**

On July 11, 2011, Kennedy began treatment at the University Pain Management Center. (Tr. 358-60). Kennedy reported experiencing progressive right leg pain since 2008. (*Id.*). She reported that the pain had spread to her lower back and described the pain as a

constant, aching sensation that traveled down the back of her leg and produced a burning

sensation. (*Id.*). She also reported numbness and tingling in her right foot. (*Id.*). According to

Kennedy, her symptoms worsened with prolonged sitting and standing and were alleviated

through heat and lying down. (*Id.*). Kennedy reported that she had worked as a CNA until

October 2010 when she had to leave her position due to a DWI. (*Id.*).

Mitchell Baker, MD, assessed Kennedy with right back pain, which radiated to

her lower right limb, and joint tenderness. (*Id.*). He recommended an MRI of the lumbosacral

spine and suggested steroid injections. (*Id.*). He recommended that she discontinue gabapentin,

continue taking Naproxen, and increased her Lyrica dosage. (*Id.*).

On July 24, 2011, an MRI was conducted of Kennedy's lumbar spine.

(Tr. 363-64). The MRI revealed degenerative changes at the L5-S1 with a large central and right

paracentral disc extrusion with a posterior annular tear compressing the bypassing right S1 nerve

root and causing mild to moderate narrowing of the thecal sac, moderate narrowing of the right

nerve root exit foramina, and mild narrowing of the left nerve root exit foramina. (*Id*).

Kennedy returned on September 8, 2011 for a follow-up appointment at the

University Pain Management Center. (Tr. 361-62). Treatment notes indicate that a lumbar

epidural steroid injection had previously been administered to Kennedy. (*Id.*). Kennedy

reported that the injection had not resulted in any significant improvement. (*Id.*). Qi Zhang,

MD, recommended that Kennedy slowly discontinue Lyrica and begin taking Tramadol. He also

recommended that she be evaluated by a neurosurgeon to assess surgical intervention. (*Id.*).

## C. **Thomas G. Rodenhouse, MD**

On November 1, 2011, Kennedy was evaluated by Thomas G. Rodenhouse

("Rodenhouse"), MD, a neurosurgeon. (Tr. 353-54). Kennedy reported continued pain in her

low back and right leg, which was not alleviated by medication or injections. (*Id.*). She reported that she previously had worked as a CNA at a nursing home, but had been out of work since April 2011. (*Id.*). According to Kennedy, she experienced occasional right posterior thigh tingling and pain that sometimes interfered with her sleep. (*Id.*).

Upon examination, Kennedy was unable to hop on her right foot, but was able to heel and toe walk. (*Id.*). She had right thigh pain with extension, and the straight leg raise test was positive on the right side at eighty degrees. (*Id.*). Her right ankle reflex was absent, but there was no sensory loss to pin, although Kennedy was sensitive throughout testing. (*Id.*). Rodenhouse recommended a lumbar laminectomy and discectomy. (*Id.*).

Rodenhouse performed the surgery on November 17, 2011. (Tr. 277). Kennedy tolerated the surgery well and was able to ambulate the following day. (Tr. 257). She was discharged on November 18, 2011. (Tr. 283).

On December 6, 2011, Kennedy returned for a post-operative appointment with Rodenhouse. (Tr. 356). Rodenhouse reported that Kennedy was "doing rather nicely" and that she was "essentially free of leg pain." (*Id.*). Her wound was benign with mild tenderness. (*Id.*). Rodenhouse advised her to "judiciously increase her activities as symptoms dictate" and to follow up in one month, at which time he hoped she would be able to return to work. (*Id.*).

On January 31, 2012, Kennedy attended a follow-up appointment with Rodenhouse. (Tr. 357). Rodenhouse reiterated that Kennedy was "doing rather nicely" and assessed that she was "essentially asymptomatic and keen to return to work." (*Id.*). Upon examination, Rodenhouse observed a benign wound, negative straight leg raise, and no weakness in her lower extremity, although she continued to demonstrate a hypoactive right ankle jerk.

(*Id.*).  Rodenhouse informed Kennedy that she was cleared to return to work in two weeks with a fifty-pound weight restriction.  (*Id.*).

### D.    **Harbinder Toor, MD**

On November 4, 2011, state examiner Harbinder Toor ("Toor"), MD, conducted a consultative internal medicine examination.  (Tr. 236-39).  Kennedy reported a constant, sharp and shooting pain in her lower back, radiating to her right leg, with occasional tingling and numbness in the right leg.  (*Id.*).  She reported difficulty standing, walking, sitting, bending, and lifting, and occasional difficulty balancing due to pain.  (*Id.*).

Kennedy reported that she was able to cook, clean, and shop as needed and could sometimes wash the laundry.  (*Id.*).  Her ability to provide childcare reportedly varied.  (*Id.*).  She showered daily and her dressing varied.  (*Id.*).  She reported that she enjoyed watching television, listening to the radio, and reading, but did not socialize or engage in sports.  (*Id.*).

Upon examination, Toor noted that Kennedy appeared to be in moderate pain, had a slightly abnormal gait with limping towards the left side, used no assistive devices, and did not need any assistance changing for the exam or rising from the chair, although she had difficulty getting on or off the exam table.  (*Id.*).  According to Toor, Kennedy declined to perform the heel-to-toe walk, squat or lie down on the examination table.  (*Id.*).

Toor noted that Kennedy's cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally.  (*Id.*).  Toor identified no scoliosis, kyphosis, or abnormality in her thoracic spine.  (*Id.*).  Toor found that her lumbar spine showed forward and lateral flexion to 20 degrees, extension zero degrees, and rotary movement to twenty degrees bilaterally.  (*Id.*).  Kennedy declined the straight leg raise in both the sitting and supine positions.  (*Id.*).  Toor observed that Kennedy had full range of motion in her shoulders, elbows,

forearms, and wrists.  (*Id.*).  He also found full range of motion in her hips, knees, and ankles bilaterally.  (*Id.*).  Toor assessed a five-out-of-five strength rating in the upper and lower extremities.  (*Id.*).  Toor found her hand and finger dexterity to be intact, and her bilateral grip strength to be five out of five.  (*Id.*).  He also reviewed an image of Kennedy's lumbosacral spine that demonstrated scoliosis and facet arthropathy at L5-S1.  (*Id.*).

Toor diagnosed Kennedy with lumbar disc disease and lower back pain radiating to the right leg.  (*Id.*).  Toor opined that she had moderate to severe limitations in standing, walking, bending, and lifting.  (*Id.*).  He also assessed moderate limitations in prolonged sitting and stated that her pain might sometimes interfere with her balance.  (*Id.*).  He noted no other limitations suggested by the examination.  (*Id.*).

## III. <u>Non-Medical Evidence</u>

In her application for benefits, Kennedy indicated that she had been born in 1974 and had completed the eleventh grade.  (Tr. 168, 173).  Kennedy reported that she had previously been employed as a CNA, a cook, a lunch aide, and a factory worker.  (Tr. 173).

During the administrative hearing, Kennedy testified that she was thirty-eight years old and lived with her two teenaged daughters.  (Tr. 41-42, 69).  At the time of the hearing, Kennedy was receiving unemployment benefits.  (Tr. 43).  Kennedy testified that she had previously been employed as a CNA, but had stopped working on the advice of her doctor due to her medical issues.  (Tr. 44-45).  She also reported previous work in a factory, as a cook in a fast food restaurant, and as a dietary aide at a nursing home.  (Tr. 47-49).

Kennedy testified that her primary health issue related to her back and the radiating leg pain that it caused.  (Tr. 50).  Kennedy testified that she did not have any other

medical impairments that affected her ability to work. (Tr. 51). According to Kennedy, her medical problems began with numbness in her right foot. (*Id.*). She went to her doctor several times and when her doctor was unable to diagnose the problem, the doctor referred Kennedy to a pain specialist. (*Id.*). Kennedy testified that the pain specialist administered an injection, which provided minimal relief. (*Id.*). The pain specialist referred her to Rodenhouse, who diagnosed her with a protruding disc in her back and recommended surgery. (Tr. 52).

Kennedy reported that she underwent back surgery in November 2011 and continued to experience back pain and stiffness after her surgery. (Tr. 53). According to Kennedy, she has stiffness in her back every morning for approximately an hour. (Tr. 54). During the day, she sometimes feels fine and sometimes does not. (*Id.*). The stiffness occurs in the area of her surgical incision. (*Id.*). According to Kennedy, the stiffness in her back irritates her when sitting and causes her leg to feel weak when walking. (Tr. 55). Kennedy estimated that she can sit for approximately twenty-five minutes before feeling "pulling" around the incision site and that she can stand for approximately one hour and walk for approximately three miles, although she must rest every thirty minutes. (Tr. 55-56). Kennedy estimated that she can lift a jug of milk, but that greater weight would cause her to experience back pain and strain. (Tr. 56).

Kennedy testified that she continues to feel pain and numbness in her right leg and foot. (*Id.*). According to Kennedy, she had initially felt better after the surgery and Rodenhouse had released her to return to work with a weight restriction. (Tr. 56, 59). Kennedy testified that her previous position was no longer available at that time. (Tr. 60-61). She began experiencing symptoms again in September. (Tr. 57-58). Kennedy sought treatment from Ingram, who indicated that she might refer Kennedy for physical therapy and for further

evaluation by Rodenhouse.  (*Id.*).  Ingram prescribed ibuprofen, which Kennedy indicated was helping to alleviate her symptoms.  (Tr. 65).

Kennedy testified that the stiffness in her back makes it difficult to find a comfortable position for sleeping and that she spends her days at home watching television. (Tr. 68).  Kennedy often lies on her stomach or side to watch television in order to alleviate her pain.  (Tr. 68-69).  According to Kennedy, she prepares meals for herself and her two daughters, ages twelve and thirteen.  (Tr. 69).  Her daughters assist with household chores and laundry. (Tr. 70).  Kennedy no longer has a driver's license.  (*Id.*).  Sometimes she does the grocery shopping, and other times her sister does.  (*Id.*).

Vocational expert Julie Andrews ("Andrews") also testified during the hearing. (Tr. 70-78).  The ALJ first asked Andrews to characterize Kennedy's previous employment. (Tr. 71-72).  According to Andrews, Kennedy previously had been employed as a CNA, a cafeteria counter attendant, and a hand packager.  (Tr. 72-75).  The ALJ then asked Andrews whether a person would be able to perform Kennedy's previous jobs who was the same age as Kennedy, with the same educational and vocational profile, and who was able to perform the full range of medium work with no further restrictions.  (Tr. 75).  Andrews testified that such an individual would be able to perform the previously-identified jobs.  (*Id.*).  Andrews testified that such an individual would also be able to perform other unskilled positions in the national and local economy, including the positions of both cleaner and industrial cleaner.  (*Id.*).

The ALJ then asked Andrews to assume an individual with the same limitations, except that she was limited to sedentary, as opposed to medium, work and could lift no more than five pounds, must change positions every fifteen minutes, and was limited to simple tasks. (Tr. 75-76).  Andrews testified that such an individual could not perform Kennedy's previous

positions, but could perform other positions in the national and local economy, including order clerk and preparer. (Tr. 76). The ALJ then asked Andrews to assume an individual with the same limitations, except that the individual could sit a maximum of two hours, stand or walk a maximum of two hours, and must lie down or be off task for the remainder of the workday. (*Id.*). Andrews testified that such an individual would be precluded from competitive employment. (*Id.*).

## DISCUSSION

I.    **Standard of Review**

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted). Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is

defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). When assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

    (1)    whether the claimant is currently engaged in substantial gainful activity;

    (2)    if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

(3)     if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

(4)     if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and

(5)     if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

"[I]f the Commissioner finds that an individual is no longer disabled, her benefits may be terminated." *Matice v. Comm'r of Soc. Sec.*, 2004 WL 437472, *3 (N.D.N.Y. 2004). Such a finding must be supported by substantial evidence demonstrating that "there has been [a] medical improvement in the individual's impairment or combination of impairments . . . , and [that] the individual is now able to engage in substantial gainful activity." 42 U.S.C. § 423(f). A "medical improvement" means "any decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled." 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1). The medical improvement must be demonstrated by changes or improvements in "the symptoms, signs, or laboratory findings associated with [a claimant's] impairment(s)." *Id.*

An eight-step evaluation process applies to an ALJ's finding that terminates a claimant's benefits due to medical improvement, including closed period cases. *See Cook v.*

*Colvin*, 2015 WL 5155720, *9 (S.D.N.Y. 2015) ("[w]hile the Second Circuit has not yet addressed whether the medical improvement standard also applies to closed period cases, other circuits have held that the standard also applies in those cases") (collecting cases); *Baker v. Comm'r of Soc. Sec.*, 2014 WL 1280306, *4 (N.D.N.Y. 2014) (same); *Ramirez v. Astrue*, 2014 WL 2520914, *6-7 (W.D.N.Y. 2014) (applying eight-step evaluation to closed period case). "Under the medical improvement analytical model, 'the burden rests with the Commissioner at every step.'" *Baker v. Comm'r of Soc. Sec.*, 2014 WL 1280306 at *5 (quoting *Deronde v. Astrue*, 2013 WL 869489, *2 (N.D.N.Y.), *report and recommendation adopted*, 2013 WL 868076 (N.D.N.Y. 2013)). For closed period cases, the most recent favorable medical decision for comparison purposes is the disability onset date. *Cook v. Colvin*, 2015 WL 5155720 at *10; *Chavis v. Astrue*, 2010 WL 624039, *8 (N.D.N.Y. 2010) ("[i]n cases where [p]laintiff has been granted a closed period of disability, the disability onset date is the point of comparison").

The eight[4] steps are:

(1)  whether the claimant is engaged in substantial gainful activity;

(2)  if not, whether any of the claimant's impairments meets or equals the severity of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

(3)  if not, whether there has been a "medical improvement" demonstrated by a decrease in medical severity;

(4)  if so, whether the medical improvement was "related to the claimant's ability to do work" (*i.e.* whether there has been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination);

---

[4]  In a DIB medical improvement review, the process begins at step one, while in a Supplemental Security Insurance ("SSI") medical improvement review, the process begins at step two. *Compare* 20 C.F.R. § 404.1594(f)(1) *with* 20 C.F.R. § 416.994(b)(5)(i).

(5)        if there has been no finding of medical improvement at step three, or if any medical improvement was found not to relate to an ability to work at step four, whether the exceptions listed in paragraphs (d) and (e) of the relevant section apply;

(6)        if medical improvement is shown to be related to ability to do work, or if one of the relevant exceptions apply, whether all of the claimant's current impairments in combination are severe;

(7)        if so, whether claimant can perform previous work based upon an assessment of the claimant's residual functional capacity considering all of the claimant's current impairments;

(8)        if claimant is unable to perform past work, whether, given claimant's residual functional capacity and considering the claimant's age, education, and past work experience, other work exists that the claimant can perform.

20 C.F.R. §§ 404.1594(f)(1)-(8) & 416.994(b)(5)(i)-(vii).

A.      **The ALJ's Decision**

        In his decision, the ALJ applied both the five-step analysis for evaluating disability claims and the eight-step analysis for evaluating medical improvements. (Tr. 19-28). Under step one of the five-step process, the ALJ found that Kennedy had not engaged in substantial gainful activity since November 1, 2010, the alleged onset date. (Tr. 23). At step two, the ALJ concluded that Kennedy had the severe impairment of degenerative disc disease. (*Id.*). At step three, the ALJ determined that Kennedy did not have an impairment (or combination of impairments) that met or medically equaled one of the listed impairments. (Tr. 26). The ALJ concluded that following the alleged onset date of November 1, 2010 through February 14, 2012, Kennedy had the Residual Functional Capacity ("RFC") to perform sedentary work, except that she could lift or carry no more than five pounds, could sit, stand or walk for only two hours during an eight-hour workday, was limited to simple tasks, and had to be

permitted to change her position every fifteen minutes. (Tr. 24-25). At steps four and five, the ALJ determined that between November 1, 2010 and February 14, 2012, Kennedy was unable to perform her prior work, and no other jobs existed in the national and regional economy that Kennedy could perform. (Tr. 25-26). Accordingly, the ALJ found that Kennedy was disabled between November 1, 2010 and February 14, 2012. (*Id.*).

The ALJ then proceeded to apply the eight-step medical improvement evaluation. (Tr. 26-28). The ALJ had already determined that Kennedy had not engaged in substantial gainful activity since November 1, 2010. (Tr. 23). At step two of the process, the ALJ determined that Kennedy did not suffer from an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 26). At step three, the ALJ determined that a medical improvement had occurred as of February 15, 2012 as result of Kennedy's successful back surgery. (Tr. 27). At step four, the ALJ determined that Kennedy's RFC for basic work activities had increased, concluding that the medical improvement was related to Kennedy's ability to work. (*Id.*). The ALJ also determined that Kennedy currently had a severe impairment of degenerative disc disease. (Tr. 26). Having found a work-related medical improvement, the ALJ proceeded to evaluate Kennedy's RFC at step seven. (Tr. 27). The ALJ determined that Kennedy had the RFC to perform the full range of medium work with no additional limitations. (Tr. 27-28). He further determined that Kennedy was able to perform her previous work as a hand packager or cafeteria attendant. (Tr. 28). Accordingly, the ALJ concluded that Kennedy's disability ended on February 15, 2012. (*Id.*).

### B.    Kennedy's Contentions

Kennedy challenges the ALJ's determination on two grounds.  First, she argues that the ALJ's determination that she experienced a medical improvement is not supported by substantial evidence because the ALJ failed to consider whether the improvement was temporary and because his RFC assessment was not supported by a medical opinion.  (Docket # 9-1 at 9-16).  Second, Kennedy contends that the ALJ failed to properly assess her credibility.  (*Id.* at 16-19).

## II.    Analysis

### A.    Medical Improvement and RFC Assessment

Kennedy argues that the ALJ's determination is flawed because he failed to consider whether her medical improvement was temporary in nature.  (*Id.* at 9-16).  According to Kennedy, although the ALJ recognized that she had recently sought treatment from Ingram relating to a reoccurrence of pain in her leg, the ALJ failed to consider this evidence in evaluating whether Kennedy had experienced a medical improvement.  (*Id.*).

Although I agree with Kennedy that the ALJ was required to consider whether her improvement was temporary in nature, I disagree that the ALJ failed to consider her subsequent treatment.  A review of the ALJ's decision demonstrates that he fully evaluated the longitudinal history of Kennedy's impairments, including the treatment that she received prior and subsequent to her surgery.

The ALJ recognized that Kennedy returned for treatment in the fall of 2012, and he properly evaluated those treatment notes.  As noted by the ALJ, Kennedy was observed upon examination to have no abnormal findings other than tenderness in her back and lower

extremities and was prescribed the relatively conservative treatment of ibuprofen and gabapentin. *See Newbold v. Colvin*, 718 F.3d 1257, 1264-65 (10th Cir. 2013) (ALJ properly relied upon conservative treatment and normal findings upon examination in concluding that claimant experienced a medical improvement). Additionally, Kennedy reported that her symptoms did not worsen with walking as they had prior to her surgery. Ultimately, the ALJ concluded that although Kennedy might experience "some residual pain," her post-surgery symptoms would not prevent her from "performing basic work activities or the activities required in medium work." (Tr. 28). On this record, I conclude that the ALJ properly considered Kennedy's post-surgery symptoms and that substantial evidence supports his conclusion that she experienced a medical improvement. *See Benedetto v. Comm'r of Soc. Sec.*, 258 F. App'x 404, 407 (3d Cir. 2007) (ALJ determination supported by substantial evidence where "[t]he ALJ concluded that 'while the claimant may have some residual pain and limitations from her prior injury and surgery, all testing and treatment indicate that she did experience improvement after successful surgery'"); *Baker*, 2014 WL 1280306 at *7 (medical improvement supported by medical evidence of decreased symptoms and normal findings, although claimant continued to experience occasional back pain); *Mosinski v. Astrue*, 2011 WL 2580353, *7 (N.D.N.Y.) ("[a]lthough [p]laintiff has pointed to evidence documenting continued . . . symptoms after [medical improvement date], the fact that [p]laintiff continues to suffer symptoms is not at issue[;] [p]laintiff has not undermined the overall assessment of the ALJ that, while [p]laintiff's condition continued to be limiting, as of [medical improvement date] he had the [RFC] to perform light work"), *report and recommendation adopted*, 2011 WL 2580347 (N.D.N.Y. 2011), *aff'd*, 484 F. App'x 578 (2d Cir. 2012).

Kennedy also argues that the ALJ's RFC assessment lacks substantial evidence because it was not supported by a medical opinion providing a function-by-function assessment of Kennedy's physical limitations. I disagree. In reaching his determination, the ALJ carefully evaluated the record evidence documenting Kennedy's medical history. As recognized by the ALJ, the medical records demonstrate that Kennedy's surgery was successful and that she experienced an alleviation of back and leg pain. Rodenhouse evaluated Kennedy during two post-operative appointments and ultimately cleared her to return to work with no limitations other than a fifty-pound weight restriction. Kennedy did not seek treatment for the following seven months and, when she did, objective findings were normal, and she was prescribed ibuprofen and gabapentin to address her complaints.

In essence, Kennedy argues that a finding of medical improvement must be supported by a medical opinion assessing a claimant's current functional limitations. Yet, the regulations provide that medical improvement determinations should be made upon the basis of the claimant's "symptoms, signs and/or laboratory findings," *see* 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1), and courts routinely uphold such determinations that are supported by medical treatment records, particularly where, as here, a successful medical procedure has been performed. *See Newbold v. Colvin*, 718 F.3d at 1263-64 (medical improvement may be found based on improvement in symptoms alone; ALJ properly relied upon claimant's statement that symptoms had improved, a one year gap in treatment, and treatment notes generally indicating that claimant was doing well and considering returning to work); *McCalmon v. Astrue*, 319 F. App'x 658, 660 (9th Cir. 2009) (ALJ properly relied upon treatment notes, lack of treatment subsequent to surgery, and daily activities in finding medical improvement); *Weirup v. Comm'r of Soc. Sec.*, 249 F. App'x 697, 698 (9th Cir. 2007) (ALJ properly relied upon medical records

documenting successful surgeries and claimant's daily activities in finding medical improvement); *Nascimento v. Colvin*, 2015 WL 1096402, *5 (E.D.N.Y. 2015) (medical improvement findings supported by substantial evidence, including treatment notes demonstrating decreased symptoms and laboratory findings indicating complete response to therapy); *Baker*, 2014 WL 1280306 at *6-7 (medical improvement supported by substantial evidence, including treatment notes documenting decreased symptoms and normal examination findings); *Solomon v. Astrue*, 2012 WL 5844700, *3-4 (N.D. Fla.) (medical improvement was demonstrated by treatment records indicating surgery followed by decrease in severity of knee problems), *report and recommendation adopted*, 2012 WL 5844727 (N.D. Fla. 2012), *aff'd*, 532 F. App'x 837 (11th Cir. 2013); *Mosinski v. Astrue*, 2011 WL 2580353 at *7 (medical improvement determination supported by treatment notes demonstrating improvement of symptoms after medical procedure); *Love v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 893, 905 (W.D. Mich. 2009) (ALJ's medical improvement determination supported by treatment records reflecting successful surgeries, normal findings on physical examinations, and medical clearance to return to work with a sit/stand option); *Latchum v. Astrue*, 2008 WL 3978081, *3 (W.D. Va. 2008) (disagreeing with a "determination that the ALJ was required to order a second [consultative examination] before making a determination of medical improvement[;] [a]ll that was required was sufficient medical evidence"; physician's note demonstrating successful surgery and improved symptoms was sufficient evidence).

In any event, the ALJ properly relied upon Rodenhouse's opinion that Kennedy could return to work with no restrictions. Kennedy contends that Rodenhouse's opinion is insufficient to support the ALJ's RFC assessment because it does not specifically indicate whether he assessed any limitations for sitting, standing, or walking. I disagree. There is no

dispute, and indeed Kennedy concedes, that her inability to work stemmed from back and leg pain and that she experienced significant improvement in those symptoms after surgery. (Docket # 9-1 at 10-11). Rodenhouse examined Kennedy prior to surgery and observed that her medical condition caused her to suffer from leg and back pain. (Tr. 353-54). He also knew that Kennedy had previously worked as a CNA – a job that the vocational expert classified as generally requiring a medium exertion. (Tr. 72, 353). Rodenhouse evaluated her during two post-surgery appointments and ultimately concluded that she could return to work so long as she limited her lifting to under fifty pounds. During those assessments, he noted that physical examinations demonstrated no leg or back abnormalities (other than a hypoactive right ankle jerk) and opined that she was free of leg pain and "essentially asymptomatic." (Tr. 356-57). Reading Rodenhouse's opinion in the context of his findings and Kennedy's medical history, it is not surprising that Rodenhouse did not find that Kennedy had limitations in sitting, standing, or walking, and his failure to make explicit findings about such limitations does invalidate the ALJ's RFC assessment in this case. *See McCalmon v. Astrue*, 319 F. App'x at 660 (ALJ properly relied upon physician reports that claimant had successful surgery, an absence of pain, and was cleared for "hiking, camping and water activities"); *Benedetto v. Comm'r of Soc. Sec.*, 258 F. App'x at 406-07 (ALJ properly based his RFC assessment on physician's treatment notes indicating an absence of objective evidence to explain claimant's pain and that claimant could return to work); *Joseph v. Astrue*, 231 F. App'x 327, 330-31 (5th Cir. 2007) (substantial evidence supported ALJ determination that claimant experienced a medical improvement permitting her to perform light work where ALJ relied on surgeon's post-operative treatment note indicating that claimant had successful surgery, normal physical examination findings, and could engage in "almost normal activity"), *cert. denied*, 552 U.S. 1111 (2008); *Abrams v. Astrue*, 2008 WL

4239996, *3 (W.D.N.Y. 2008) ("[the ALJ] relied on the report of plaintiff's treating neurological surgeon . . . , which indicated that plaintiff was doing well following two lumbar microdis[c]ectomy surgeries . . . , and was able to return to his regular work duties without restrictions").

B.    **Credibility Assessment**

I turn next to Kennedy's contention that the ALJ's credibility analysis is flawed. (Docket # 9-1 at 17-18). Kennedy maintains that the ALJ found her not credible solely because her subjective complaints were not corroborated by objective medical evidence. (*Id.*).

An ALJ's credibility assessment should reflect a two-step analysis. *Robins v. Astrue*, 2011 WL 2446371, *4 (E.D.N.Y. 2011). First, the ALJ must determine whether the evidence reflects that the claimant has a medically determinable impairment or impairments that could produce the relevant symptom. *Id.* (citing 20 C.F.R. § 404.1529). Next, the ALJ must evaluate "the intensity, persistence and limiting effects of the symptom, which requires a credibility assessment based on the entire case record." *Id.* (citing 20 C.F.R. § 404.1529(c)). The relevant factors for the ALJ to weigh include:

> (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate her pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of her pain or other symptoms; (6) any measures the claimant uses or has used to relieve her pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

*Id.* (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii)).

In this case, the ALJ concluded that Kennedy's statements "concerning the intensity, persistence and limiting effects of [her] symptoms are not credible beginning February

15, 2012, to the extent that they are inconsistent with the [RFC] for the reasons explained below." (Tr. 27). In doing so, the ALJ assessed Kennedy's subjective complaints in the context of a comprehensive review of the post-surgery record. I disagree with Kenney's contention that the ALJ failed to support his credibility determination.

As an initial matter, although Kennedy correctly notes that an ALJ may not reject a claimant's statements about the effect of his or her symptoms solely because they are not substantiated by objective medical evidence, the absence of such evidence is "one factor that the [ALJ] must consider in assessing [the claimant's] credibility[,] and must be considered in the context of all the evidence." SSR 96-7p, 1996 WL 374186, *6 (1996); *see also Walker v. Astrue*, 2009 WL 586585, *13 (E.D. Mo. 2009) ("[w]hile an ALJ may not reject a claimant's subjective complaints based solely on the lack of medical evidence to fully corroborate the complaint, . . . the absence of an objective medical basis to support the degree of [p]laintiff's subjective complaints is an important factor in evaluating the credibility of the testimony and the complaints"). In his determination, the ALJ reviewed the medical records, which demonstrated a successful surgery and essentially normal examination findings despite Kennedy's renewed complaints of discomfort. Thus, the ALJ properly considered the lack of medical evidence in reaching his credibility determination.

In any event, in concluding that Kennedy's statements concerning the intensity and limiting effects of her symptoms were less than credible, the ALJ considered the entire post-surgery record, including Rodenhouse's opinion that she could return to work, and the relatively conservative treatment recommended by Ingram for residual pain. (Tr. 27-28). Despite Kennedy's testimony that her ability to walk after surgery was limited by her symptoms (Tr. 55), the ALJ noted that Kennedy reported to Ingram that her pain did not increase with

walking. (Tr. 27). In sum, I conclude that the ALJ applied the correct legal standard in assessing Kennedy's credibility and that his credibility determination is supported by substantial evidence in the record. *See Palacios v. Astrue*, 2012 WL 601874, *5-6 (C.D. Cal. 2012) (ALJ's credibility determination supported by substantial evidence, including essentially normal physical examination findings and surgeon's opinion that claimant could perform a range of light work, in the absence of medical evidence corroborating claimant's allegations of disabling pain).

## CONCLUSION

This Court finds that the Commissioner's denial of DIB was based on substantial evidence and was not erroneous as a matter of law. Accordingly, the ALJ's decision is affirmed. For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 11)** is **GRANTED**. Kennedy's motion for judgment on the pleadings **(Docket # 9)** is **DENIED**, and Kennedy's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      September 17, 2015